# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 14-CR-24-GKF |
| | ) | |
| MICHAEL MEDLOCK, | ) | |
| | ) | |
| Defendant. | ) | |

## **OPINION AND ORDER**

Now before the court is plaintiff's Motion to Reconsider Order Granting New Trial [Dkt. #91]. Defendant Michael Medlock ("Medlock") was convicted of ten counts of bank fraud and three counts of money laundering on July 31, 2014. On August 8, 2014, the district judge who tried the case recused, and the matter was reassigned to the undersigned judge. Medlock subsequently moved for a new trial on three grounds: ineffective assistance of counsel, the lack of a jury instruction on the defense of good faith, and insufficiency of the evidence. At an evidentiary hearing on January 6, 2015, the court granted Medlock's Motion for New Trial based on the ineffective assistance of defendant's former counsel, Ernest A. Bedford ("Bedford"). [Dkt. ##68, 89; Dkt. #90, pp. 184-88]. Having found ineffective assistance of counsel, the court did not reach the other two grounds offered in defendant's motion for a new trial. Plaintiff now asks the court to reconsider its earlier decision and deny defendant's Motion for New Trial.

### I.     Governing Legal Standards

A motion to reconsider a court's ruling may be granted under certain circumstances, including where, after the court's order, there has been an intervening change in the controlling law or new evidence has surfaced that was previously unavailable. *See United States v. Christy*,

739 F.3d 534, 539 (10th Cir. 2014). In its motion to reconsider, plaintiff argues another basis for granting its motion to reconsider, specifically, the need to "correct clear error or prevent manifest injustice." *Id*.

As noted above, the court granted a new trial on the basis of ineffective assistance of counsel. To establish that counsel was ineffective at a level requiring a new trial, Medlock was required to show that his counsel's performance was constitutionally deficient, and that this deficient performance was prejudicial. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). The proper measure of attorney performance is reasonableness under prevailing professional norms. *Strickland,* 466 U.S. at 688. This is an objective standard of reasonableness. *Id*. A court's review of an attorney's performance must be "highly deferential," made with a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id*. at 689. However, "the mere incantation of 'strategy' does not insulate attorney behavior from review." *Fisher v. Gibson*, 282 F.3d 1283, 1296 (10th Cir. 2002) (quoting *Brecheen v. Reynolds*, 41 F.3d 1343, 1369 (10th Cir. 1994)). Relevant here, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland,* 466 U.S. at 691. This duty derives from counsel's basic purpose, "to make the adversarial testing process work," which it cannot do "unless defense counsel has done some investigation into the prosecution's case and into various defense strategies." *Williamson v. Ward*, 110 F.3d 1508, 1514 (10th Cir. 1997) (quoting *Strickland*, 466 U.S. at 690 & *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986)). A decision not to investigate cannot be deemed reasonable if it is uninformed. *Heard v. Addison*, 728 F.3d 1170, 1180 (10th Cir. 2013)

To find prejudice, the defendant need not prove that counsel's errors clearly changed the outcome of the case, or even that the errors "more likely than not" altered the outcome. *Strickland*, 466 U.S. at 694. The defendant must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. A reasonable probability is "sufficient to undermine confidence in the outcome." *Id*.

**II.     The Indictment**

Medlock was indicted on fifteen counts of bank fraud and, in addition, three counts of money laundering based on payments made with the alleged proceeds of bank fraud. The fifteen counts of bank fraud related to Medlock's activity as president and owner of Klutts Equipment, Inc. ("Klutts"), a company Medlock purchased in 2003 through a holding company called Vincens Omnibus, LLC ("Vincens"). Klutts took out a loan with ONB Bank & Trust Company ("ONB"), offering as collateral, *inter alia*, Klutts's accounts receivable. To secure the accounts receivable, ONB and Klutts entered into a "lockbox" agreement. Def. Ex. #35. Under the lockbox agreement, Klutts was to deposit all of its accounts receivable into a specific account at ONB.

Starting in November 2008—and continuing to February 2011—railroad equipment entities or related individuals made fifteen separate payments into three accounts other than the lockbox account. Medlock managed each of these three accounts. In the indictment, the government alleged Medlock had devised and carried out a scheme to defraud ONB by causing fifteen of Klutts's accounts receivable to be deposited in the other bank accounts. Each of the fifteen counts of bank fraud was based on one of these alleged transactions.

In 2009, Klutts fell behind on its loan repayment, and ONB became concerned at how few accounts receivable payments were being deposited in the lockbox account. In December

2009, Medlock became concerned ONB might exercise its right under the lockbox agreement to "freeze" the lockbox account, preventing Klutts from making any further withdrawals from the account. On December 18, 2009, Medlock met with Bedford for the first time. Bedford was referred by Medlock's friend Ron Brewer. Medlock asked Bedford what to do if ONB froze the account. *See* Def. Ex. #39. Bedford advised him to open another account so that Klutts could continue to operate.

On December 24, 2009, ONB froze the lockbox account. Medlock already had another account at BOK bank for personal use, with an account number ending in -0399. After ONB froze the lockbox account, Medlock opened a second account at BOK bank, with an account number ending in -7837. Medlock also opened an account with IBC bank, with an account number ending in -2702. These are the three bank accounts into which the fifteen payments underlying the fifteen counts in the indictment were deposited.

The individual payments were made by five different individuals or entities: Dana Galgana (Counts 1-2); Galgana's business Cricket Enterprises (Counts 2-3, 5-6, 8-12, 15); Allen Engineering Contractor, Inc. (Count 4); Grace Railroad Contractors (Count 7); and Progressive Rail, Inc. (Counts 13-14). Each of the payments was made to one of the following individuals or entities: Michael Medlock (Counts 1-3, 5-6, 8-9, 15); Klutts (Counts 4, 7, 10, 14); and "Vincens/Klutts" (Counts 11-13). All five of the counts on which Medlock was acquitted related to payments from Cricket Enterprises to Michael Medlock (Counts 5-6, 8-9, 15). The counts are summarized in the following table:

| Count | Result at Trial | Date of Payment | Payee Bank Account | Amount | Payor | Payee |
|---|---|---|---|---|---|---|
| 1 | Convicted | 11/19/2008 | BOK-0399 | $24,681.00 | Dana Galgana | Michael C Medlock |
| 2 | Convicted | 12/3/2008 | BOK-0399 | $9,875.00 | Dana Galgana (Cricket Enterprises) | Michael C Medlock |
| 3 | Convicted | 12/9/2008 | BOK-0399 | $42,000.00 | Cricket Enterprises | Michael C Medlock |
| 4 | Convicted | 6/17/2009 | BOK-0399 | $18,300.00 | Allen Engineering Contractor, Inc. | Klutts Equipment Inc (note: address 4500 Enid Street, Muskogee, OK) |
| 5 | Acquitted | 8/27/2009 | BOK-0399 | $17,000.00 | Cricket Enterprises | Michael Medlock |
| 6 | Acquitted | 8/28/2009 | BOK-0399 | $10,000.00 | Cricket Enterprises | Michael Medlock |
| 7 | Convicted | 9/15/2009 | BOK-0399 | $30,250.00 | Grace Railroad Contractors | Klutts Equipment (note: address PO Box 606, Muskogee, OK) |
| 8 | Acquitted | 11/4/2009 | BOK-0399 | $8,750.00 | Cricket Enterprises | Michael C Medlock |
| 9 | Acquitted | 2/1/2010 | BOK-0399 | $6,250.00 | Cricket Enterprises | Michael C Medlock |
| 10 | Convicted | 4/28/2010 | IBC-2702 | $21,735.00 | Cricket Enterprises | Klutts Equipment (PO Box 606) |
| 11 | Convicted | 9/10/2010 | IBC-2702 | $15,000.00 | Cricket Enterprises | Vincens/Klutts (4500 Enid Street) |
| 12 | Convicted | 9/27/2010 | IBC-2702 | $2,900.00 | Cricket Enterprises | Vincens/Klutts (4500 Enid Street) |
| 13 | Convicted | 11/16/2010 | IBC-2702 | $42,500.00 | Progressive Rail, Inc. | Vincens/Klutts Equipment (4500 Enid Street) |
| 14 | Convicted | 1/27/2011 | BOK-7837 | $45,430.00 | Progressive Rail, Inc. | Klutts Equipment (PO Box 606) |
| 15 | Acquitted | 2/23/2011 | BOK-0399 | $10,454.98 | Cricket Enterprises | Michael C Medlock |

### III. Counsel's Preparation of Medlock's Defense

In January 2010, ONB sued for foreclosure on Klutts's assets. Because of Bedford's familiarity with the banking relationship, Medlock hired Bedford to represent Klutts in the foreclosure action. Bedford also represented Medlock when federal agents began the investigation that eventually resulted in the indictment.

Bedford and Medlock began to prepare for the criminal proceedings well before the indictment. In July 2013, Bedford sent Medlock a text discussing the possibility of bringing in an expert witness to testify regarding relevant banking procedures. Bedford knew another lawyer, Art Fleak ("Fleak"), who had used such a witness. Fleak joined the Medlock defense team initially to manage the expert witness, but took on more responsibility over time. [*See generally*, Dkt. #90, pp. 142-56].

After the indictment in January 2014, the defense considered several arguments for the upcoming trial, including two relevant here. First, Medlock could argue the fifteen payments were not Klutts accounts receivable at all, but rather were payments made to Medlock in his personal capacity as a broker of railroad equipment transactions. Second, Medlock could argue he opened the second and third accounts (BOK-7837 & IBC-2702) upon the advice of Bedford, his legal counsel, who also advised Medlock to use all three accounts to carry on Klutts business after ONB froze the lockbox account. The arguments for ineffective assistance of counsel in Medlock's Motion for New Trial related to the development and presentation of these two defenses.

#### a. *Separate Brokerage Business*

Several of Medlock's arguments based upon ineffective assistance of counsel concern Medlock's defense that the fifteen transactions underlying the bank fraud counts were not related

to Klutts business, but instead were commission fees for deals Medlock brokered in his individual capacity. Specifically, Medlock argued Bedford and Fleak failed to investigate the details of the fifteen transactions the prosecution alleged were instances of bank fraud. Relatedly, Medlock argued Bedford and Fleak failed to issue discovery requests to the prosecution for documentation received from Dana Galgana, a participant in many of the transactions, in spite of evidence that the prosecution had more documentation than it produced to the defense. Medlock further argued Bedford and Fleak, unarmed with detailed information about the transactions, failed to cross-examine Galgana effectively at trial. Finally, Medlock argued Bedford and Fleak erred in failing to seek a continuance to investigate information contained in a document produced the day before trial.

After receiving the indictment, Medlock assembled information regarding the fifteen transactions and sent detailed summaries to Bedford and Fleak to explain, and defend, the payments. [Dkt. #100-2, pp. 14-29, 51-63]. In addition, Medlock provided presentation slides describing the first eight counts in detail. [*Id*.] Medlock noted Counts 9-15 related to transfers made after ONB froze the lockbox account, and thus were directed to other accounts pursuant to Bedford's legal advice. [*See* Dkt. #100-2, p. 25; *see also infra*, section III.b].

At the evidentiary hearing on the Motion for New Trial, Bedford testified that, in spite of receiving this information from his client well in advance of the trial, he made no effort whatsoever to contact any of the parties to those transactions.[1] [*See* Dkt. #90. pp. 116-22

---

[1] Fleak testified Bedford was responsible for contacting any third-party witnesses. Fleak did not contact any of the individuals involved in the transactions. [Dkt. #90, pp. 148-49].

(covering Counts 1-8—Counts 9-12 & 15 each involve at least some of the same parties)].[2] Nor did Bedford or Fleak issue any discovery requests to the government or subpoenas to the parties to the individual transactions to obtain documentation related thereto. [*Id*. at 116-17, 149-150]. Bedford did not cover the details of these transactions in his direct examination of Medlock during the trial. [*See id*. at 119].

At the evidentiary hearing, Bedford testified he did not conduct this discovery because he concluded the information those individuals possessed would not be helpful to the defense. [*Id*. at 116]. Under questioning from Medlock's new counsel, Bedford offered a slightly different rationale for not contacting any of the parties to the transactions: Bedford worried the individuals would have information *detrimental* to Medlock's defense. [*Id*. at 118]. Medlock's new counsel then asked:

> Q: I mean, did you want to be surprised by [any detrimental documents] at trial?
> A: No.
> Q: You'd rather have all of the documents that Mr. Galgana [individual related to transactions underlying Counts 1-3, 5-6, 8-12, 15] might possess about these transactions in order to defend them; correct?
> A: We felt like we had all the documents that the government was going to use. I didn't want to give the government some more ammunition.
> Q: But you didn't do anything to determine independently what other information Mr. Galgana might have had?
> A: That's true.

[Dkt. #90, p. 118]. The court concluded this failure amounted to ineffective assistance of counsel and was the "most egregious" of Bedford's failures in defending Medlock. [*See* Dkt. #90, pp. 185-86].

Other failures were related to the failure to investigate this defense. As noted above, Bedford and Fleak did not subpoena documents from parties to the individual transactions,

---

[2] Although Medlock's new counsel did not ask Bedford about his efforts, if any, to contact Progressive Rail, Inc. ("Progressive") in connection with Counts 13-14, Medlock testified he never received any information from Bedford or Fleak that suggested contact between his lawyers and Progressive or its employees. [Dkt. #90, p. 56].

including Dana Galgana, the key witness for the prosecution on Counts 1-3, 5-6, 8-12, and 15. Medlock argued Bedford and Fleak also failed to pursue another avenue to obtain Galgana's documents. Medlock had a conversation with Galgana in which the latter described his productions to the government as "many documents." Def. Ex. #2, p. 1. The defense only received two pages of Galgana documents initially, and a few additional documents the week before trial. Def. Ex. ##1-6. Although Medlock expressed concern to Bedford and Fleak on multiple occasions that the prosecution had more Galgana documents than they had produced to the defense, the record does not show Bedford or Fleak addressed the issue with the prosecution informally, nor did they make a formal discovery request for this documentation.

At least in part because Fleak and Bedford failed to investigate the transaction details provided by their client, Fleak's cross examination of Galgana did not address those details. Galgana's cross examination established: Galgana himself brokered railroad equipment transactions in a private capacity; Galgana did not know how Medlock's business was related to Klutts; while Galgana thought Medlock's brokering was related to Klutts, he did not know for certain, and; Galgana knew Klutts's business included railroad equipment repair. [Dkt. #62, pp. 185-193]. Fleak asked no questions about the specifics of the transactions underlying Counts 1-3, 5-6, 8-12, and 15. [*Id.*]. While the strategic choice to take a more general approach to cross examination is normally entitled to deference, no deference is due when counsel's choice is uninformed due to a failure to investigate. *See Strickland*, 466 U.S. at 690-691 ("strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.").

On Sunday afternoon, July 27, 2014, the day before the trial began, the prosecution sent Fleak a single-page summary chart prepared by former Klutts employee Sara Rothrock, which

the prosecution said it anticipated using at trial. Def. Ex. #30, p. 3. Rothrock's chart included information regarding twenty-six Klutts invoices—mislabeled "checks" in the chart—from 2010 and 2011, including an invoice related to the payment underlying Count 14 and another invoice for Cricket Enterprises, the entity related to Counts 1-3 & 10-12. [Dkt. #68-5, p. 25]. The prosecution sent the document to Fleak, who forwarded it to Medlock asking for his thoughts. Def. Ex. #30, p. 2-3. Medlock noted a seeming gap in the chart and made a few other comments. *Id*. He characterized the chart as "inconsequential" because all of the transactions listed therein occurred after ONB froze the lockbox account. *Id*. Based on other emails sent that weekend, at the time he made that characterization, Medlock reasonably anticipated any counts based on transactions after that date would be covered by the advice of counsel defense. *See* discussion *infra*, section III.b. Thus, Medlock's opinion that the document was "inconsequential," was reasonably tethered to his anticipation of the advice of counsel defense, which was not presented. Medlock advised his counsel that he would protest the document's late production. Def. Ex. #30, p. 2. At the outset of trial, Fleak objected to the late production, but neither Fleak nor Bedford sought a continuance to investigate the information in the chart and its relevance to Medlock's defenses. [Dkt. #61, p. 12].

By failing to investigate the details of the fifteen transactions in the indictment, Bedford and Fleak overlooked evidence favorable to Medlock's primary defense that the payments were unrelated to Klutts business. For example, at the evidentiary hearing on the Motion for New Trial, John McBride of Smith Railway Construction testified he participated in a transaction in which Medlock acted as a broker in his personal capacity. Medlock also offered declarations by Joseph Fields and Greg Prunty to similar effect. [Dkt. #68-7; Def. Ex. #49].

Bedford and Fleak's failure to investigate the details of these transactions prejudiced Medlock's defense for every count of the indictment on which Medlock was eventually convicted. The failure to investigate the details of the transactions involving Dana Galgana made it impossible for Bedford and Fleak to defend Counts 1-3 & 10-12 effectively. Bedford and Fleak's failure to investigate the details of the transaction involving either Raincross Engineering[3] or Allen Engineering Contractor, Inc. made it impossible to defend Count 4 effectively. Bedford and Fleak's failure to investigate the details of the transaction involving Grace Railroad Contractors made it impossible to defend Count 7 effectively. Bedford and Fleak's failure to investigate the details of the transactions involving Progressive Rail, Inc. made it impossible to defend Counts 13-14 effectively. Because Counts 16-17 allege money laundering based on payments made from the BOK-0399 account, Bedford and Fleak's failures regarding Counts 1-4 & 7 also prejudiced their defense of Counts 16-17. Count 18 bears a similar relationship to the IBC-2702 account at issue in Counts 10-13.

The prosecution argued Medlock was acquitted on five counts, and for each of those counts, Medlock personally was the payee on the check or transfer. This may suggest the jury at least partially credited Medlock's "side brokerage" defense. The prosecution argued this shows Medlock was not prejudiced by the failure to present this defense more fully. To the contrary, Medlock's acquittals are at best ambiguous on this point, and in fact may demonstrate prejudice. If the jury credited Medlock's side brokerage defense, a more fulsome explanation of the remaining ten transactions may have persuaded them to acquit on those counts as well.

Bedford failed in his duty to conduct a reasonable investigation or to "make a reasonable decision that [these] particular investigations [were] unnecessary." *Strickland,* 466 U.S. at 691.

---

[3] Medlock told Bedford and Fleak the transaction underlying Count 4 involved Raincross Engineering, not Allen Engineering Contractor, Inc. [Dkt. #100-2, p. 20].

Bedford's failure frustrated the "adversarial testing process" required for a fair trial. *See Williamson*, 110 F.3d at 1514. On the basis of the errors described above, the court, applying Fed. R. Crim. P. 33(a), concluded that the interests of justice required vacating the judgment and granting a new trial based on ineffective assistance of counsel. [Dkt. #90, pp. 184-88]. The government has not offered an adequate basis to disturb this conclusion.

### b. *Advice of Counsel*

As early as April 2014, the defense planned to present testimonial evidence to the jury that Bedford advised Medlock to open the second and third accounts (BOK-7837 & IBC-2702) and to use all three accounts to conduct Klutts business after ONB froze the lockbox account. On April 2, 2014, Fleak encouraged Medlock and Bedford to prepare testimony regarding Medlock's reliance on Bedford's legal advice. [*See* Dkt. #100-2, p. 1; Def. Ex. #17 ("Mike's testimony about getting legal advise [sic] to do what he did seems critical to a valid defense.")]. On July 9, 2014, Fleak emailed Medlock and Bedford with a draft "game plan" for the trial, in which Bedford was listed as a witness. Def. Ex. #18. The following week, Fleak mentioned Bedford's testimony in communications with the prosecution. [*See* Dkt. #100-2, pp. 2-4; Def. Ex. #19]. The prosecutor, Jeffrey Gallant ("Gallant"), told Fleak it would be unethical for Bedford to be counsel and a witness simultaneously. [Dkt. #100-2, pp. 2-4]. Furthermore, Gallant argued Bedford, by testifying, would waive attorney-client privilege and allow Gallant to ask Bedford about statements made during pre-indictment discussions. [*Id*.]. Specifically, Gallant claimed Bedford had said Medlock would plead guilty. [*Id*.]. Fleak, in a subsequent email to Medlock and Bedford, recommended Bedford participate as trial counsel and not as a witness. [*Id*.] Medlock expressed surprise and wrote in reply that he hoped Bedford had not told Gallant he would plead guilty. [*Id*.]. In response, Bedford expressed shock that Gallant would

think he had said Medlock would plead guilty. [*Id*.]. On July 21, 2014, Gallant filed a motion *in limine* regarding the potential advice of counsel defense. [Dkt. #27]. In that motion, Gallant claimed Bedford had said Medlock would plead guilty because he was, in fact, guilty of bank fraud. [*Id.*].

In spite of Fleak's suggestion that Bedford might serve only as an attorney, the trial preparation continued under the assumption that Bedford would testify in support of the advice of counsel argument. On July 24, 2014, the Thursday before Medlock's trial began on Monday, July 28, Medlock sent several emails regarding trial strategy, all premised on his understanding that Bedford would testify. *See* Def. Ex. ##25, 27. Two emails from Fleak on the same day also indicate it was still the plan for Bedford to testify. *See* Def. Ex. ##26, 28. At 9:33pm on Sunday the 27th, the night before trial, Bedford entered an appearance as counsel for Medlock. [*See* Dkt. #32]. In the same minute, at 9:33pm, Bedford emailed Medlock and Fleak with a reference to the last-minute change:

> "As far as I'm concerned and as is the facts at hand, until this weekend ----when [the entry of appearance was] filed, I [became] actual counsel for [Medlock] in this criminal case and before then I was to be a witness--------yes I previously represented [Medlock] in the [ONB foreclosure action] and in other civile[*sic*]/business matters and in regard to the pre-indictment dealings with [Gallant and the FBI agent investigating Medlock]……."

Def. Ex. #30 (ellipses in original). At some point that day, Bedford sent Medlock a text message stating that they could "weave in advice of counsel indirectly" by explaining to the jury that Medlock had opened the second BOK account in part because his attorney, *i.e.* Bedford, had a "strong working relationship" with the staff at that bank. Def. Ex. #31. The next morning, at the beginning of the trial, Fleak and Bedford told the court they would not offer an advice of counsel defense. [Dkt. #61, pp. 3-5]. The trial transcript suggests Medlock had an emotional outburst in the courtroom at that time. [*See id*., p. 5].

In requesting a new trial, Medlock argued Fleak and Bedford's last-second decision to abandon the advice of counsel defense constituted ineffective assistance. The court finds, based on the evidence presented, that until the night before trial, Bedford and Fleak advised Medlock, and Medlock expected, that Bedford would testify he had advised Medlock to open the second and third accounts and to use all three accounts to conduct Klutts business after ONB froze the lockbox account. The record also suggests Bedford had self-serving reasons for withdrawing the defense, including the desire to avoid having to testify regarding his previous disbarment, to avoid the possibility threatened by the government of having to testify he had told Gallant Medlock was guilty and would plead guilty, or potentially having to testify he advised his client to commit bank fraud, if that was in fact the substance of his advice.

And yet, the record also shows there may have been other, legitimate reasons not to present the defense. For example, Bedford testified he was not aware of Klutts's obligation to put all accounts receivable in the ONB lockbox account at the time he advised Medlock to open the other accounts. [*See* Dkt. #90, p. 105 (Bedford testified, "I have no knowledge there was [accounts receivable] pledge before I dealt with the government")].[4] Furthermore, the advice of counsel defense potentially conflicts with the defense presented at trial, that the transactions in the indictment represented Medlock's private brokerage activity. Bedford's alleged advice to open new accounts *to conduct Klutts business* would either be irrelevant or wholly inconsistent with that defense. Thus, it would have been reasonable *not* to present the advice of counsel

---

[4] Bedford testified he first learned of the lockbox account during conversations with federal investigators leading up to Medlock's indictment. Medlock's new counsel argued Bedford was aware of the lockbox agreement when advising Medlock to open the new account. In January 2010, ONB sued for foreclosure on Klutts's other assets. The petition for foreclosure included references to the lockbox agreement. Bedford, who represented Klutts in that matter, prepared the answer to the foreclosure petition, but testified he did not notice the lockbox provision in the attachments to the petition. [Dkt. #90, pp. 100-08].

argument in order to present a simpler, more consistent theory of defense.  In sum, legitimate reasons existed not to present the advice of counsel defense.

The record strongly suggests that Bedford and Fleak surprised their client by withdrawing the advice of counsel defense only hours before the trial began.  Yet, given the deference a court must show to an attorney's judgment when considering a claim of ineffective assistance, upon reconsideration, the court declines to find ineffective assistance of counsel on the basis that Bedford and Fleak failed to present the advice of counsel defense at trial.  However, the withdrawal of the advice of counsel defense aggravated the prejudice caused by the failure to investigate, discussed *supra*.  Because Medlock expected the advice of counsel defense to apply to Counts 9-15, he did not provide Bedford and Fleak with detailed information on those transactions.  A proper investigation of the details of those transactions might have shown that the transactions underlying Counts 10-14, on which Medlock was convicted, were the result of Medlock's private brokerage.  [*See* Dkt. #100-2, p. 25].

Because the court found ineffective assistance of counsel based on the failure to investigate and related errors, it did not base its ruling on Medlock's other arguments for ineffective assistance, including trial counsel's failed attempt to present expert testimony and their failure to seek a jury instruction regarding good faith.  Nor did the court base its ruling on Medlock's other arguments for a new trial, including the lack of a jury instruction that the government was required to prove Medlock's guilt of the crime "as charged" and insufficiency of the evidence presented by the prosecutor.

Having reconsidered its ruling granting a new trial, the court does not find "clear error" or "manifest injustice" requiring reversal.

WHEREFORE, the government's Motion to Reconsider Order Granting New Trial [Dkt. #91] is denied.

DATED this 8th day of April, 2015.

_____
GREGORY K. FRIZZELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT